## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRENNA CAMMERON,<br><br>Plaintiff,<br><br>v.<br><br>DMG MEDIA LTD., MAIL MEDIA INC. d/b/a MAILONLINE, and ROBIN RAVEN, in his individual and professional capacities,<br><br>Defendants. | Civil Action No.: 1:23-cv-10137<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Brenna Cammeron ("Plaintiff"), by and through her undersigned counsel, Grubin Law Group, P.C., hereby alleges as follows against Defendants DMG Media Ltd. ("DMG"), Mail Media, Inc. d/b/a MailOnline ("Mail Media"), and Robin Raven (together, "Defendants"):

## <u>NATURE OF THE CLAIMS</u>

1.      DMG and Mail Media own and operate *MailOnline*, an online tabloid notorious for its brazenly misogynistic, homophobic, and anti-transgender headlines, and salacious featured stories—including countless articles logged under the header, "Transgender Issues – News and Updates on Gender Ideology" on its homepage.[1]

2.      Unsurprisingly, the toxic content spewed by Defendants has seeped into their workplace culture, which reinforces the discrimination and misogyny that makes *MailOnline* at once so popular and so reviled:

- Former Publisher of *MailOnline* Martin Clarke's meetings were referred to as "vagina monologues" because of his notoriously frequent use of the phrase "cunt."

- Mr. Clarke said he hired Plaintiff over another candidate because Plaintiff has a "more feminine look" and was frequently heard saying, "A pretty girl never hurts."

---

[1] *See* https://www.dailymail.co.uk/news/transgender-issues/index.html (last visited Nov. 21, 2023).

- "I'll be nicer if you'll be smarter." – Sean Walsh, DMG's Global Chief Brand Officer and Managing Director of U.S. Operations, to a senior female executive.

- Richard Caccappolo, DMG's Chief Executive Officer and Mail Media's Chief Operating Officer, routinely commented on the wardrobe, appearance, and dating life of his executive assistant in both external and internal meetings.

3.      Against this backdrop, Plaintiff began working for Defendants in October 2019 in the hopes of starting an exciting new chapter in her career—only to fall victim to Defendants' culture of misogyny and be pushed out of DMG and Mail Media for speaking up, like so many women before her.

4.      After years of suffering a hostile work environment at considerable cost to her own physical and mental well-being, Plaintiff finally complained of gender discrimination.

5.      Shortly thereafter, she raised the prospect of taking protected medical leave to address her well-known, mental health-related disabilities, desperately requiring some time away from the discriminatory culture fostered by Defendants to recuperate.

6.      Just one week later, Defendants fired her, ostensibly as part of a "restructuring" that impacted Plaintiff and no one else.

7.      For myriad reasons detailed below, Defendants' claim that they terminated Plaintiff's employment as part of a supposed reduction-in-force is blatantly pretextual.

8.      Moreover, the evening Defendants fired Plaintiff, Mr. Raven resolved any doubt as to Defendants' unlawful motive, telling one of Plaintiff's former colleagues that Defendants fired Plaintiff because: **"There's [*sic*] a lot of mental health issues on your team."**

9.      To redress these wrongs, Plaintiff brings claims for violations of: (i) the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* ("FMLA"); (ii) the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL"); (iii) the New York City Human Rights Law,

N.Y.C. Admin. Code §§ 8-101, *et seq*. ("NYCHRL"); and (iv) the New York Labor Law, N.Y. Lab. Law ("NYLL") § 215.

## JURISDICTION AND VENUE

10.     Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA.

11.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's related claims arising under State and City law.

12.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## ADMINISTRATIVE PREREQUISITES

13.     Contemporaneously with this filing, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging claims under, *inter alia*: (i) Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII"); and (ii) the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101, *et seq*. ("ADA").

14.     Following her receipt of a Notice of Right to Sue from the EEOC, Plaintiff intends to seek leave of the Court to file an Amended Complaint alleging, *inter alia*, additional claims under Title VII and the ADA.

15.     Any and all other prerequisites to the filing of this action have been met.

## PARTIES

**A.     Plaintiff Brenna Cammeron**

16.     Plaintiff is a resident of the State of New York.

17.     Plaintiff was employed by Mail Media from in or around October 2019 through on or around March 10, 2023.

18.     Plaintiff was coterminously employed by DMG from in or around October 2022 through on or around March 10, 2023.

19.     Plaintiff was a full-time employee of Defendants and, at all relevant times, worked at least 1,250 hours in any 12-month period, including the 12-month period preceding her FMLA-qualifying leave and the subsequent termination of her employment.

20.     At all relevant times, Plaintiff was an "employee" of Defendants within the meaning of all relevant statutes and applicable regulations thereunder.

**B.      Defendant DMG Media Ltd.**

21.     DMG is a foreign limited company with its principal place of business located at Northcliffe House, 2 Derry Street, London, England W8 5TT.

22.     DMG employs 50 or more employees within a 75-mile radius of the location where Plaintiff worked.

23.     At all relevant times, DMG established, implemented, disseminated, and controlled all of employment policies applicable to Plaintiff.

24.     At all relevant times, DMG controlled and directed the terms and conditions of Plaintiff's employment.

25.     At all relevant times, DMG maintained and exercised the power to hire, fire, discipline, and promote Plaintiffs.

26.     At all relevant times, DMG was an "employer" within the meaning of all relevant statutes and applicable regulations thereunder.

C.    **Defendant Mail Media, Inc. d/b/a MailOnline**

27.    Mail Media is a foreign corporation with its principal place of business located at 51 Astor Place, 9th Floor, New York, New York 10003.

28.    Mail Media employs 50 or more employees within a 75-mile radius of the location where Plaintiff worked.

29.    At all relevant times, Mail Media established, implemented, disseminated, and controlled all of employment policies applicable to Plaintiff.

30.    At all relevant times, Mail Media controlled and directed the terms and conditions of Plaintiff's employment.

31.    At all relevant times, Mail Media maintained and exercised the power to hire, fire, discipline, and promote Plaintiffs.

32.    At all relevant times, Mail Media was an "employer" within the meaning of all relevant statutes and applicable regulations thereunder.

D.    **Defendant Robin Raven**

33.    Mr. Raven is a resident of London, England and serves as the Chief Product Officer ("CPO") of DMG.

34.    In this role, Mr. Raven at all relevant times acted, directly or indirectly, in the interests of DMG with respect to Plaintiff and other DMG employees.

35.    At all relevant times, Mr. Raven established, implemented, disseminated, and controlled all of employment policies applicable to Plaintiff.

36.    At all relevant times, Mr. Raven controlled and directed the terms and conditions of Plaintiff's employment.

37.     At all relevant times, Mr. Raven maintained and exercised the power to hire, fire, discipline, and promote Plaintiffs.

38.     At all relevant times, Mr. Raven was an "employer" within the meaning of all relevant statutes and applicable regulations thereunder.

## FACTS

### A.     Background

39.     Plaintiff—who has a deep background in journalism, print media, and online media—brought her extensive experience to Mail Media in or around October 2019 as an Audience Development Manager.

40.     In doing so, Plaintiff took a significant turn in her career, moving from the editorial side to the business side of journalism, though even at Mail Media (and later at DMG) she still managed a team of editors.

41.     While Plaintiff's passion remained (and still remains) in editorial work, she was excited to take on a new challenge.

42.     As Audience Development Manager, Plaintiff led the editorial side of global news partnerships with organizations such as MSN, YouTube, and Apple News.

43.     Further, she developed and refined content strategy for off-platform partners, and worked with the *MailOnline* newsroom to develop those partnerships.

44.     As Audience Development Manager, Plaintiff supervised an international team of managers, editors, and producers.

45.     Plaintiff was hired by Mail Media's then-Global Director of Platform Partnerships, who soon became Plaintiff's mentor (up until she was forced to resign due to the toll the hostile work environment at DMG and Mail Media took upon her mental health).

46.     Plaintiff was incredibly successful by any measure during her time with Defendants, leveraging her deep background in journalism and web-based growth for online news organizations to generate massive revenue for DMG and Mail Media.

47.     By way of example only, Plaintiff grew her team from three to eight full-time employees, tripled web traffic as part of *MailOnline*'s partnership with MSN, and elevated the *MailOnline* YouTube channel from generating almost no revenue at all to bringing in nearly $1 million annually.

48.     Plaintiff also worked closely with the legal, editorial, and complaints teams,[2] frequently catching factual errors, and created the content strategy and quality-maintenance program for all off-platform content delivery.

49.     Furthermore, she took her position as a team leader extremely seriously, and coached her team in best practices that resulted in their delivery of exceptional results.

50.     All told, in 2022, Plaintiff's team delivered approximately $5 million in revenue for DMG on a shoestring budget, with the revenue Plaintiff and her team generated outstripping overhead nearly tenfold.

**B.     Rampant Sexism, Misogyny, and Discrimination at DMG and Mail Media**

51.     While delivering excellent results throughout her employment with DMG and Mail Media, Plaintiff witnessed and experienced grossly disparate treatment of female employees, as well as a workplace environment that wreaked havoc on the physical, mental, and emotional health of its workforce, and especially its female employees—including Plaintiff.

52.     Indeed, gender discrimination and misogyny are endemic at DMG and Mail Media, as evidenced by the statements and conduct of the companies' all-male senior leadership, as well

---

[2] The complaints team is a subdepartment within Standards & Compliance at DMG, which reviews and responds to reader complaints—undoubtedly a department that *MailOnline* always keeps busy.

as the countless women who were fired for making protected complaints or constructively discharged when the discriminatory workplace culture at DMG and Mail Media drove them to their breaking points.

53.     For example, Martin Clarke, formerly the Publisher of *MailOnline*, was notorious within DMG and Mail Media for his frequent use of the misogynistic and pejorative term "cunt," which he often said to and in reference to women.

54.     Plaintiff personally witnessed Mr. Clarke use this word on countless occasions, oftentimes to insult one of Plaintiff's female mentors, such as by screaming at her, "Don't be such a fucking cunt about this!"

55.     In fact, Mr. Clarke said "cunt" so regularly that other men at DMG and Mail Media referred to meetings with Mr. Clarke as "vagina monologues."

56.     Further, Mr. Clarke made it known when he hired Plaintiff that he selected her over another female candidate because Plaintiff had a "more feminine look."

57.     As Mr. Clarke could often be heard saying, "A pretty girl never hurts."

58.     Consistent with Mr. Clarke's reputation, he had a long-running sexual relationship with a female Mail Media executive, who was exited after the inappropriate relationship came to light.

59.     Further, Mr. Clarke bought his female executive assistant four- to five-inch high-heel shoes, which he insisted she wear around the office.

60.     Stephen Kinsella, DMG's Director of Analytics & Data Technologies, likewise has a reputation for misogyny, has made sexual comments statements to female staffers, and has been the subject of numerous internal gender discrimination complaints.

61.     Moreover, Sean Walsh, DMG's Global Chief Brand Officer and Managing Director of U.S. Operations, is well-known within DMG and Mail Media as a womanizer and homophobe.

62.     For example, as Plaintiff herself witnessed, Mr. Walsh frequently demeaned and talked down to Plaintiff's supervisor—and, when she voiced her objection to his comments and tone, lashed out at her with insulting retorts like, "I'll be nicer if you'll be smarter."

63.     Notably, Mr. Walsh fired at least two women on his team in retaliation for their complaints to Human Resources ("HR") about his gender discrimination and harassment.

64.     Similarly, Oliver Smith was permitted to resign as Mail Media's Chief Technology Officer earlier this year in the aftermath of gender discrimination complaints lodged against him.

65.     Moreover, in or around Fall 2020, Plaintiff attempted to join a conversation involving Michael Raynor, *MailOnline*'s Director of Project Management and Delivery, and three other male employees.

66.     When Plaintiff asked what they were discussing, Mr. Raynor replied that they were talking about a smartphone application "for when you want to fuck somebody in your immediate radius, right away—like Grindr but for straight people."

67.     Additionally, Gerard Greaves was installed as *MailOnline*'s Editor-in-Chief in or around 2022, despite little to no experience in online media, ousting the far more qualified Louise Thomas in the process, even though Ms. Thomas had held the position for just a few months and had proven effective in the role.

68.     DMG and Mail Media's swift replacement of a successful female Editor-in-Chief with an unqualified man illustrates how the companies' misogyny informs the manner in which they handle personnel matters.

69.     Richard Caccappolo—DMG's Chief Executive Officer ("CEO") and Mail Media's Chief Operating Officer—is yet another male executive who has perpetuated this sexist corporate culture.

70.     For example, Mr. Caccappolo routinely commented on the wardrobe, appearance, and dating life of his executive assistant in both external and internal meetings.

71.     Moreover, women at DMG and Mail Media are routinely excluded from off-site events, such as ski and golf trips.

72.     Most recently, in or around May 2022, Plaintiff and other women in senior leadership were not invited to a "boys only" golf trip in Spain organized by DMG and Mail Media.

73.     Likewise, off-site meetings where only men in senior leadership participate are commonplace at DMG and Mail Media.

74.     This discriminatory culture is a product of not just the men at the helm at DMG and Mail Media, but also the fact that DMG's senior leadership comprises exclusively men.[3]

75.     Women, on the other hand, consistently find that they can remain employed only if they tacitly agree to endure this misogynistic corporate culture in silence and come to terms with the stagnation of their careers.

76.     If and when they seek advancement—or, worse yet, complain of discrimination— they are virtually always fired or, alternatively, harassed until they hit their psychological breaking points and are forced to resign in the name of their mental health.

## C.     Plaintiff's Assumption of New Responsibilities, and Request for A Raise and Support In Connection with the Same

77.     In or around October 2022, Plaintiff's supervisor and mentor (a woman) took medical leave.

---

[3] *See* https://www.dmgmedia.co.uk/about/dmg-media-leadership/ (last visited Nov. 21, 2023).

78.     After her supervisor's medical leave began, Plaintiff was asked to take over the role of Global Director of Platform Partnerships for DMG, while still carrying out all of her own job duties as Mail Media's Audience Development Manager, without advance notice or any additional support.

79.     Plaintiff asked several times for support and for her compensation to be increased in recognition of the fact that her responsibilities had now essentially doubled; however, these requests were summarily denied without any meaningful consideration.

80.     Worse yet, Plaintiff's reasonable requests were met with open hostility by Mr. Caccappolo, who was plainly angered by Plaintiff's efforts to seek equitable treatment, instead of suffering in silence as he apparently expected women at DMG and Mail Media to do.

81.     Specifically, in or around December 2022, Mr. Caccappolo met with Plaintiff, ostensibly for Plaintiff's first one-on-one meeting with the CEO, now that she had taken on the role of Global Director of Platform Partnerships.

82.     Indeed, Plaintiff's predecessor met with Mr. Caccappolo regularly to discuss her work.

83.     However, Mr. Caccappolo did not make any mention of Plaintiff's work during this meeting.

84.     Apparently aware of Plaintiff's request for greater pay, Mr. Caccappolo instead used their time together to scream at Plaintiff and threaten to fire her.

85.     Plaintiff endured this vitriolic attack for approximately one hour.

86.     Notably, Mr. Caccappolo's verbal assault of Plaintiff was strikingly similar to the way he shouted down Plaintiff's mentor when she likewise asked for equitable compensation or a promotion.

87.     Indeed, Mr. Caccappolo has a reputation for chastising and intimidating women who ask for raises and promotions, whereas men are rarely if ever the targets of his wrath.

88.     Plaintiff was so shocked and disheartened by this conversation that she requested a meeting with Suzanna Fayman, Mail Media's HR Director, during which Ms. Fayman assured Plaintiff that she had a wonderful reputation within DMG and Mail Media, and that under no circumstances was her job in danger.

89.     According to Ms. Fayman, Mr. Caccappolo was merely in a "bad mood" that day.

90.     Ms. Fayman's writing off Mr. Caccappolo's inappropriate conduct speaks to both the regularity with which similar harassment occurred and the culture of silence DMG and Mail Media executives have imposed upon their female subordinates.

91.     Plaintiff's supervisor eventually left DMG and Mail Media at the end of her medical leave rather than returning to the discriminatory workplace culture fostered by Defendants, resulting in Plaintiff's workload remaining at double what it had been prior.

92.     Even so, Plaintiff continued to achieve stunning results for Defendants, including by, *inter alia*, managing the DMG-wide editorial launch of a multimillion-dollar partnership with Google News Showcase for six brands.

93.     Indeed, Plaintiff continued to successfully manage her own role as well as the role left by her former supervisor—all while traveling back and forth between the United Kingdom and New York City at Defendants' behest.

94.     Defendants, however, refused to allocate any additional resources towards Plaintiff, denying all requests for raises and new hires.

95.     Mr. Caccappolo even went so far as to pull his approval for two previously approved junior-level staffers that had been allocated to ensure a smooth launch of the partnership with Google that Plaintiff was managing.

96.     Meanwhile, in or around late January 2023, Robin Raven—CPO of DMG and Plaintiff's direct manager since her supervisor's sudden departure—pushed Plaintiff to further add to her workload by asking that she put together a business case for her  promotion and permanent relocation to the United Kingdom.

97.     Ever dedicated to her job and ambitious, Plaintiff readily agreed to do so, pushing herself to work even harder to make the case for a promotion.

98.     Unsurprisingly in light of the manner in which Defendants have treated women historically, nothing came of Plaintiff's business case.

99.     On the contrary, she was seemingly asked to prepare it solely to placate her, as Defendants plainly had no intent of ever promoting Plaintiff or giving her a raise that recognized her for stepping into the role of Global Director of Platform Partnerships.

100.     In sharp contrast to the manner in which Defendants treated Plaintiff (not to mention Plaintiff's supervisor), men throughout DMG and Mail Media could count on management to allocate significant resources to their roles and projects.

101.     By way of example only, upon his promotion from Head of Social Media to Chief Product Officer – Editorial for Mail Media, Christopher Lawrence was given the tools he needed to succeed.

102.     Indeed, all while refusing to make a single hire to support Plaintiff, Defendants advertised a backfill for his former role, as well as six additional hires to produce TikTok videos for DMG and Mail Media.

103.    Likewise, Mail Media's Growth Manager and YouTube Lead Ben Rabinovich—Plaintiff's direct report—went over Plaintiff's head and complained directly to Mr. Caccappolo that one of his projects was under-resourced.

104.    Rather than viciously attacking Mr. Rabinovich and threatening to fire him, as Mr. Caccappolo had done in response to Plaintiff's analogous request, Mr. Caccappolo scheduled a one-on-one meeting with Mr. Rabinovich to discuss how Defendants could better support his work.

**D.    Plaintiff's Protected Complaints**

105.    In or around December 2022, Plaintiff met with Liz Daffern, Head of HR for the United Kingdom, about Mr. Rabinovich going over her head and receiving the additional support he sought, whereas Plaintiff was attacked for making a similar request.

106.    Ms. Daffern deemed Mr. Rabinovich's complaint to be insubordination so egregious to warrant dismissal; however, Mr. Rabinovich was not subjected to any discipline whatsoever.

107.    Days later, Ms. Daffern discouraged Plaintiff from pursuing any internal disciplinary action against Mr. Rabinovich, commenting that once Mr. Caccappolo became involved, Plaintiff should allow him to handle the fallout from his insubordination.

108.    Of course, there was no fallout whatsoever, as Mr. Rabinovich and men at DMG and Mail Media, generally, were subject to an entirely different workplace standard that to which Plaintiff and her female colleagues were held.

109.    Neither of Mr. Rabinovich's two superiors, both women, were even invited to attend this hour-long, boys only meeting.

110.     Accordingly, during a subsequent Zoom meeting with Ms. Daffern, Plaintiff finally mustered the courage to complain about the gender discrimination to which she had been subjected throughout her tenure at DMG and Mail Media, seeing the disparity between how Mr. Caccappolo responded to Mr. Rabinovich's and her own request for additional support as a prime example of the same.

111.     Discussing this disparity, Plaintiff told Ms. Daffern, "This would not happen at another company, and a female junior staffer would never have been permitted" by DMG and Mail Media to breach corporate hierarchy in the way Mr. Rabinovich did.

112.     Plaintiff then elaborated, "It's quite obvious that there is an element of sexism here."

113.     Rather than query Plaintiff, Ms. Daffern suddenly ended the conversation and logged off of the videoconference.

114.     In or around late February 2023, Plaintiff also complained to Mr. Raven about sexism within DMG and Mail Media, citing the same incident with Mr. Rabinovich as an example.

115.     As Plaintiff also shared with Mr. Raven, she felt that Stephen Kinsella, Oliver Smith, and others within DMG and Mail Media's predominantly male senior leadership were sexist and misogynist.

116.     Further, Plaintiff explained that the manner in which male senior leaders interacted with her made her uncomfortable, and that she felt their refusal to listen to and empower female staffers such as herself was limiting their team's success.

E.      **Defendants' Notice of Plaintiff's Mental Health-Related Disabilities and Plaintiff's Expression of Intent to Take FMLA-Qualifying Leave**

117.    By in or around early March 2023, Plaintiff's health had seriously deteriorated due to the stress and anxiety of the hostile work environment Defendants had fostered.

118.    By way of illustration, from in or around October 2022 through in or around March 2023, Plaintiff went from being on a minimum of medications for mild insomnia to no less than six daily medications for anxiety, panic attacks, depression, and severe insomnia.

119.    Plaintiff's anxiety, panic attacks, depression, and severe insomnia substantially limit one or more major life activities, including, *inter alia*, eating, sleeping, speaking, thinking, communicating, and working.

120.    Plaintiff's anxiety, panic attacks, depression, and severe insomnia also substantially limit one or more major bodily functions, including, *inter alia*, her neurological and brain functions.

121.    Therefore, Plaintiff's anxiety, panic attacks, depression, and severe insomnia amount to disabilities.

122.    There is no question that Mr. Raven, in particular, was well aware of the catastrophic effect that the hostile work environment fostered by Defendants was having on Plaintiff.

123.    Multiple times per week, Plaintiff told Mr. Raven that she was unraveling and was at risk of going down the same path as her former supervisor—*i.e.*, being forced to take mental leave to cope with the discriminatory work environment at DMG and Mail Media.

124.    Rather than offer support, Mr. Raven offered dismissive responses that smacked of misogyny.

125.   For example, on one such occasion, Mr. Raven told Plaintiff that she was likely suffering from "imposter syndrome" and assured her that she was "doing great" and "smashing it."

126.   Further, in or around February 2023, Plaintiff confided in Mr. Raven that she had walked home from a work event in a "flood of tears."

127.   Even James Welsh, DMG's Deputy CEO, told Communications Director Katie Byrne that he noticed Plaintiff was "pulling her hair out" at work, thereby underscoring the widespread knowledge of Plaintiff's severe mental health disabilities.

128.   Despite Defendants' open acknowledgement of Plaintiff's disabilities, at no point were Plaintiff's deteriorating health or well-being, which she voiced repeatedly, taken seriously by any member of DMG's and Mail Media's all-male senior management.

129.   In fact, the only expression of empathy came from a nurse in Mail Media's London office, who suggested that she "just quit" for the sake of her health.

130.   Moreover, based on the mental health-related disabilities from which Plaintiff was suffering, HR had already set up bi-weekly check-in calls with her to keep tabs on her physical and emotional state.

131.   In short, it is beyond dispute that Defendants were on notice of Plaintiff's disabilities, the fact that her health was at risk, and that she was considering taking a leave.

132.   Further, Plaintiff's therapist, who she saw weekly, suggested several times that she either quit or go on medical leave, as she appeared to be on the brink of a total breakdown.

133.   On or around March 3, 2023, Plaintiff spoke with Ms. Fayman about one of Plaintiff's direct reports, who had suggested she might take medical leave.

134.   Plaintiff pointedly advised Ms. Fayman, "If anyone is going to take medical leave, it should be me."

135.   Plaintiff went on to say that she was at her breaking point, mentally and physically, and that she knew everyone who worked with her could see it.

136.   Plaintiff called out sick due to a "stomach bug" on or around March 6, 2023 and March 7, 2023.

137.   In truth, however, she took those two days off of work to cope with mental health-related disabilities variously caused and exacerbated by the hostile and abusive work environment to which Defendants had subjected her.

**F.**   **Discriminatory and Retaliatory Termination of Plaintiff's Employment, In Interference with Her FMLA Rights**

138.   On or around March 10, 2023 (*i.e.*, one week after Ms. Cammeron raised the prospect of taking FMLA-qualifying leave with Ms. Fayman), Plaintiff met again with Ms. Fayman via Zoom, during which Ms. Fayman informed her that DMG and Mail Media were "going in a different direction."

139.   Thus, Defendants had decided to terminate Plaintiff's employment, effective immediately.

140.   Ms. Fayman went on to say that the termination was not performance based, as Plaintiff was a "fantastic" employee.

141.   Unable to conceal Defendants' transparently discriminatory and retaliatory termination with any legitimate stated reason for firing Plaintiff, Fayman instead characterized the termination as part of a "routine restructuring."

142.    In the same breath, however, Ms. Fayman shared with Plaintiff that she fought to have DMG and Mail Media include an extended period of health insurance coverage in their offer of severance, telling Plaintiff, "I knew this would be important to you."

143.    In doing so, Ms. Fayman resolved any doubt that Defendants were well aware of Plaintiff's disabilities and need for FMLA-qualifying leave when they fired Plaintiff.

144.    Further, this purported layoff tellingly impacted only Plaintiff—none of her direct reports or team members, nor anyone else in the entire U.S. was let go.

145.    Moreover, the fact that DMG and Mail Media are currently making significant investments to grow the U.S. digital market further belies the claim that Defendants fired Plaintiff as part of a supposed downsizing.

146.    Further highlighting the pretextual nature of the Company's decision, Plaintiff's role was filled by a new hire almost immediately after her termination.

147.    Specifically, a male employee is now working for Defendants under Plaintiff's title, and assumed the role only days after Plaintiff's termination.

148.    In reality, Defendants abruptly ousted Plaintiff based on her gender, disabilities, protected complaint, use of protected sick time, and notification of her intent to take FMLA-qualifying leave.

149.    Rather than deal with another female employee made sick by the work environment fostered at DMG and Mail Media, Defendants chose to terminate Plaintiff's employment before she could take a protected leave.

## G.    Mr. Raven's Admission of Defendants' Unlawful Motive

150.    Unbelievably, following Plaintiff's termination, Mr. Raven announced Defendants' discriminatory and retaliatory motive to at least one other employee.

151.    Specifically, the same day Defendants fired Plaintiff, Mr. Raven reached out to several employees to discuss Plaintiff's termination, apparently concerned about the fallout that would inevitably flow from Defendants sudden, unjustifiable decision.

152.    When one such employee expressed surprise over Plaintiff's firing and asked why Defendants had let her go, Mr. Raven responded: "There's [*sic*] a lot of mental health issues on your team."

<u>**FIRST CAUSE OF ACTION**</u>
<u>**FMLA: INTERFERENCE**</u>

153.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

154.    During the full statutory period, Plaintiff was protected by the provisions of the FMLA and all applicable regulations thereunder.

155.    Specifically, Plaintiff was a full-time employee of Defendants and, at all relevant times, worked at least 1,250 hours in any 12-month period, including the 12-month period preceding her expression of intent to take FMLA-qualifying leave and the subsequent termination of her employment.

156.    Further, Defendants employ 50 or more employees within a 75-mile radius of the location where Plaintiff worked.

157.    As set forth above, on or around March 3, 2023, Plaintiff expressed her intent to take an FMLA-qualifying leave of absence in connection with mental health-related disabilities.

158.    Even before then, Defendants were well aware of Plaintiff's mental health-related disabilities and the fact that she would likely require FMLA-qualifying leave in the future.

159.    By the actions described above, among others, Defendants unlawfully interfered with her rights under the FMLA by, *inter alia*, terminating her employment as a means to prevent her from taking FMLA-qualifying leave.

160.    Defendants' unlawful interference with Plaintiff's FMLA rights was intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference thereto.

161.    As a direct and proximate result of Defendants' unlawful interference with her FMLA rights, Plaintiff has suffered and continue to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including, without limitation, economic damages, prejudgment interest, compensatory damages for emotional distress, punitive damages, liquidated damages, and recovery of her reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## FMLA: RETALIATION

162.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

163.    During the full statutory period, Plaintiff was protected by the provisions of the FMLA and all applicable regulations thereunder.

164.    Specifically, Plaintiff was a full-time employee of Defendants and, at all relevant times, worked at least 1,250 hours in any 12-month period, including the 12-month period preceding her expression of intent to take FMLA-qualifying leave and the subsequent termination of her employment.

165.    Further, Defendants employ 50 or more employees within a 75-mile radius of the location where Plaintiff worked.

166.    As set forth above, on or around March 3, 2023, Plaintiff expressed her intent to take an FMLA-qualifying leave of absence in connection with mental health-related disabilities.

167.    By the actions described above, among others, Defendants unlawfully retaliated against Plaintiff for exercising her rights under the FMLA by, *inter alia*, terminating her employment.

168.    Defendants' unlawful retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the FMLA.

169.    As a direct and proximate result of Defendants' unlawful retaliatory conduct, Plaintiff has suffered and continue to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including, without limitation, economic damages, prejudgment interest, compensatory damages for emotional distress, punitive damages, liquidated damages, and recovery of her reasonable attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
**NYSHRL: SEX DISCRIMINATION**

170.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

171.    During the full statutory period, Plaintiff was protected by the provisions of the NYSHRL and all applicable regulations thereunder.

172.    During the full statutory period, Defendants were subject to the provisions of the NYSHRL and all applicable regulations thereunder.

173.    By the actions described above, among others, Defendants discriminated against Plaintiff based on her sex in violation of the NYSHRL by, *inter alia*, subjecting her to a hostile work environment and terminating their employment.

174.    Defendants' unlawful discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL.

175.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including, without limitation, economic damages, prejudgment interest, compensatory damages for emotional distress, punitive damages, and recovery of her reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
## NYSHRL: DISABILITY DISCRIMINATION

176.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

177.    During the full statutory period, Plaintiff was protected by the provisions of the NYSHRL and all applicable regulations thereunder.

178.    During the full statutory period, Defendants were subject to the provisions of the NYSHRL and all applicable regulations thereunder.

179.    By the actions described above, among others, Defendants discriminated against Plaintiff based on her actual or perceived disabilities in violation of the NYSHRL by, *inter alia*, terminating their employment.

180.    Defendants' unlawful discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL.

181.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages

to the greatest extent permitted by law, including, without limitation, economic damages, prejudgment interest, compensatory damages for emotional distress, punitive damages, and recovery of her reasonable attorneys' fees and costs.

## FIFTH CAUSE OF ACTION
## NYSHRL: RETALIATION

182.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

183.    During the full statutory period, Plaintiff was protected by the provisions of the NYSHRL and all applicable regulations thereunder.

184.    During the full statutory period, Defendants were subject to the provisions of the NYSHRL and all applicable regulations thereunder.

185.    As set forth above, Plaintiff engaged in protected activities under the NYSHRL by, *inter alia*, complaining of gender discrimination in or around December 2022.

186.    By the actions described above, among others, Defendants retaliated against Plaintiff for engaging in protected activities by, *inter alia*, terminating her employment less than three months later.

187.    Defendants' unlawful retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL.

188.    As a direct and proximate result of Defendants' unlawful retaliatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including, without limitation, economic damages, prejudgment interest, compensatory damages for emotional distress, punitive damages, and recovery of her reasonable attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
## NYCHRL: GENDER DISCRIMINATION

189.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

190.    During the full statutory period, Plaintiff was protected by the provisions of the NYCHRL and all applicable regulations thereunder.

191.    During the full statutory period, Defendants were subject to the provisions of the NYCHRL and all applicable regulations thereunder.

192.    By the actions described above, among others, Defendants discriminated against Plaintiff based on her gender in violation of the NYCHRL by, *inter alia*, subjecting her to a hostile work environment terminating their employment.

193.    Defendants' unlawful discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL.

194.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she entitled to an award of damages to the greatest extent permitted by law, including, without limitation, economic damages, prejudgment interest, compensatory damages for emotional distress, punitive damages, and recovery of her reasonable attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION
## NYCHRL: DISABILITY DISCRIMINATION

195.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

196.    During the full statutory period, Plaintiff were protected by the provisions of the NYCHRL and all applicable regulations thereunder.

197.    During the full statutory period, Defendants was subject to the provisions of the NYCHRL and all applicable regulations thereunder.

198.    By the actions described above, among others, Defendants discriminated against Plaintiff based on her actual or perceived disabilities in violation of the NYCHRL by, *inter alia*, terminating her employment.

199.    Defendants' unlawful discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL.

200.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she entitled to an award of damages to the greatest extent permitted by law, including, without limitation, economic damages, prejudgment interest, compensatory damages for emotional distress, punitive damages, and recovery of her reasonable attorneys' fees and costs.

## **EIGHTH CAUSE OF ACTION**
## **NYCHRL: RETALIATION**

201.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

202.    During the full statutory period, Plaintiff was protected by the provisions of the NYCHRL and all applicable regulations thereunder.

203.    During the full statutory period, Defendants were subject to the provisions of the NYCHRL and all applicable regulations thereunder.

204.     As set forth above, Plaintiff engaged in protected activities under the NYCHRL by, *inter alia*, complaining of gender discrimination in or around December 2022.

205.     By the actions described above, among others, Defendants retaliated against Plaintiff for engaging in protected activities by, *inter alia*, terminating her employment less than three months later.

206.     Defendants' unlawful retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL.

207.     As a direct and proximate result of Defendants' unlawful retaliatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including, without limitation, economic damages, prejudgment interest, compensatory damages for emotional distress, punitive damages, and recovery of her reasonable attorneys' fees and costs.

## NINTH CAUSE OF ACTION
## NYLL § 215: DISCRIMINATION AND RETALIATION

208.     Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

209.     During the full statutory period, Plaintiff was protected by the provisions of NYLL § 215 and all applicable rules and regulations thereunder.

210.     During the full statutory period, Defendants were subject to the provisions of NYLL § 215 and all applicable rules and regulations thereunder.

211.     NYLL § 215 prohibits employers, including Defendants, from discharging, threatening, penalizing, or in another manner discriminating or retaliating against any employee,

including Plaintiff, *inter alia*, "because such employee has used any legally protected absence pursuant to federal, local, or state law."

212.    As set forth above, Plaintiff expressed her intent to take FMLA-qualifying leave and took sick leave in connection with her disabilities, both which were legally protected under federal, New York State, and New York City law.

213.    Specifically, Plaintiff's expression of her intent to take FMLA-qualifying leave and sick leave in connection with her disabilities were protected, *inter alia*, under the FMLA, ADA, NYSHRL, NYCHRL, the sick leave requirements outlined in NYLL § 196-b, and the New York City Earned Sick Time Act, N.Y.C. Admin. Code §§ 20-912, *et seq.*

214.    Defendants discriminated and retaliated against Plaintiff for her protected activities in violation of NYLL § 215 by, *inter alia*, terminating her employment.

215.    As a direct and proximate result of Defendants' unlawful, discriminatory, and retaliatory conduct, Plaintiff has suffered and continue to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including, without limitation, economic damages, prejudgment interest, compensatory damages for emotional distress, punitive damages, liquidated damages, and recovery of her reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request that the Court:

A.    Declare that the practices complained of herein are unlawful under applicable federal, State, and City law;

B.    Grant an injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.       Grant Plaintiff an award of damages in an amount to be determined at trial to compensate her for her economic loss;

D.       Grant Plaintiff an award of damages in an amount to be determined at trial to compensate her for all non-monetary and/or compensatory damages she has suffered, including, without limitation, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

E.       Grant Plaintiff an award of damages in an amount to be determined at trial for any and all other monetary and/or non-monetary losses she is suffered;

F.       Grant Plaintiff an award of prejudgment interest where applicable;

G.       Grant Plaintiff an award of punitive damages in an amount to be determined at trial;

H.       Grant Plaintiff an award of liquidated damages in an amount to be determined at trial;

I.       Grant Plaintiff an award of reasonable attorneys' fees to the greatest extent permitted by law;

J.       Grant Plaintiff an award of reasonable costs that she has incurred in this action, including, without limitation, expert witness fees;

K.       Grant Plaintiff all other available damages to the greatest extent permitted by law; and

L.       Grant such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues of fact and damages.

Dated: November 21, 2023
      New York, New York

**GRUBIN LAW GROUP, P.C.**

By: _____
    Scott G. Grubin
    Alex J. Hartzband
    Rita Lenane-Massey

1330 Avenue of the Americas, Suite 23A
New York, New York 10019
Telephone: (212) 653-0631
sgrubin@grubinlaw.com
ahartzband@grubinlaw.com
rlmassey@grubinlaw.com